FAMILY DEVELOPMENT, LTD., Indiana Department of Environmental Management, and Indiana Office of Environmental Adjudication, Appellants–Respondents,

v.

STEUBEN COUNTY WASTE WATCHERS, INC., Appellee–Petitioner.

No. 49A02–0005–CV–301.

Court of Appeals of Indiana.

June 8, 2001.

Rehearing Denied August 9, 2001.

James P. Fenton, Alan VerPlanck, Eilbacher Scott, P.C., Fort Wayne, IN, Attorneys for Appellant Family Development, Ltd.

Karen M. Freeman–Wilson, Attorney General of Indiana, Janet L. Parsanko, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant Indiana Department of Environmental Management.

Lawrence A. Vanore, Sommer & Barnard, PC, Indianapolis, IN, Attorney for Appellee.

## OPINION

BROOK, Judge.

### Case Summary

Appellants-respondents Family Development, Ltd. ("FDL") and Indiana Department of Environmental Management ("IDEM") (collectively, "appellants") challenge the trial court's reversal of the Indiana Office of Environmental Adjudication's ("OEA") grant of summary judgment and dismissal against appellee-petitioner Steuben County Waste Watchers, Inc. ("Waste Watchers"). We reverse.

### Issues

Appellants raise several issues for review, which we combine and restate as follows:

I. whether Waste Watchers had standing to petition for administrative and judicial review; and

II. whether the trial court erred in reversing OEA's order.

### Facts and Procedural History [1]

FDL's predecessor-in-interest [2] owned property in rural Steuben County containing approximately 4.02 acres of wetlands that it planned to excavate and fill during the construction of a proposed solid waste landfill adjacent to an abandoned landfill ("the Apollo landfill"). On April 19, 1996, FDL requested a Section 401 water quality certification ("WQC") from IDEM under 33 U.S.C. § 1341(a) as a prerequisite to obtaining a Section 404 dredge-and-fill permit from the U.S. Army Corps of Engineers under 33 U.S.C. § 1344. IDEM instructed FDL that it could not grant a WQC without adequate wetlands mitigation. On April 21, 1997, FDL submitted to IDEM a mitigation plan that proposed restoring or creating approximately seven acres "of wetland offsite adjacent to Fish Creek and it's [sic] adjacent wetlands." On June 30, 1997, IDEM issued a WQC reading in relevant part as follows:

> Based on the site investigation and available information, it is the judgment of this office that the proposed project *will comply* with the applicable provisions of the 327 IAC 2 sections 301, 302, 303, 306, and 307 [3] of the Clean Water Act *if the applicant complies with the*

---

1. We heard oral argument in this case on May 17, 2001, in Indianapolis. We commend counsel for their thorough preparation and thoughtful presentations.

2. FDL acquired title to the property at issue from National Serv–All, Inc. on September 11, 1997. We shall refer solely to FDL for purposes of clarity.

3. *See* 33 U.S.C. §§ 1311–13, 1316–17.

*conditions set forth below.* Therefore, subject to the following conditions, [IDEM] hereby grants Section 401 Water Quality Certification:

1. The mitigation, monitoring, final success criteria, and land use restriction will be consistent with the plans attached to your April 21, 1997, correspondence.

2. The existing wetlands, upon which the facility intends to construct a Municipal Solid Waste Landfill, constitute a zone of recharge for the significant aquifer that underlays the site at an approximate depth of 50 feet. Because of this intimate hydraulic connection of the deeper residential water supply aquifer with surface soils, the wetland impacts are acceptable only if the design of the landfill conforms to 329 IAC 10–17–2(b) which is an upgraded design standard based on the proximity of an aquifer of significance.

3. The project engineer at the construction site will ensure that construction limits shown in the plans attached to the correspondence of April 21, 1997, will be clearly marked at all times during construction.

4. The contractor performing the actual operations must comply with Section 311 of the Federal Clean Water Act and with 327 IAC 2–6.1 concerning spills of oil and hazardous materials.

5. Deposition of dredged or excavated materials and all earthwork operations must be carried out in such a manner that soil erosion and sediment runoff to any nearby water body are controlled and minimized.

(Emphases added.)

The U.S. Army Corps of Engineers issued a public notice for the project on July 17, 1997. On August 25, 1997, Waste Watchers and an individual named June Fee Haskins ("Haskins") petitioned OEA for administrative review of the WQC and a stay of issuance pending a review decision. Waste Watchers asserted that it

> is a non-profit public interest environmental organization, existing under the laws of the State of Indiana and comprised of members interested in the health and general welfare of the citizens of Steuben County who would be adversely affected by a decision having an adverse environmental impact on its members or geographical area. Many of the members are located within the watershed of the proposed landfill.

Haskins asserted that she owned real estate adjacent to the proposed landfill. Collectively referring to themselves as "Aggrieved Party," Waste Watchers and Haskins claimed that they were notified of IDEM's issuance of the WQC but were not notified that IDEM had been considering FDL's WQC request. In their petition, Waste Watchers and Haskins expressed concern that the WQC had not adequately addressed the issues of zoning, storm-water runoff, the drainage of contaminated leachate from the Apollo landfill, and the filling of the wetlands, which allegedly absorb storm-water runoff and serve as a natural filter for the contaminated leachate.

On January 13, 1998, Waste Watchers filed a summary judgment motion seeking reversal of the WQC and requesting "IDEM to open a public notice and comment period and to hold a public hearing on [FDL's] application." [4] On January 15,

---

4. The summary judgment motion does not appear in the record. Waste Watcher's brief

1998, FDL filed a motion to dismiss Waste Watchers and Haskins' petition or, in the alternative, for summary judgment. In its motion, FDL asserted that OEA had no jurisdiction over zoning issues[5] and that the storm-water runoff and leachate issues were "not germane to the issuance of the [WQC], but relate[d] purely to matters of enforcement which can and would be addressed in the future in the hypothetical event that any enforcement action becomes necessary."

On January 26, 1998, IDEM filed a response to Waste Watchers' summary judgment motion and a brief in support of FDL's motion. In its brief, IDEM noted that 329 IAC 10–20–11 requires an "owner, operator, or permittee" of a municipal solid waste landfill ("MSWLF") to "design, construct, and maintain ... a run-off control system from the active portion of the MSWLF to collect and control at least the water volume resulting from a twenty-four (24) hour, twenty-five (25) year storm"; moreover, the "[r]un-off from the active portion of the MSWLF must be handled in accordance with 327 IAC 15–5,[6] 327 IAC 15–6,[7] and the discharge must meet the effluent limitations of the National Pollutant Discharge Elimination System ["NPDES"] under 327 IAC 5." IDEM noted that FDL "would be required to comply with this rule in the event IDEM approves its landfill application and [FDL] moved forward with the activities described in the [Section] 401 application."

On January 27, 1998, FDL filed a memorandum in opposition to Waste Watchers'

summary judgment motion. With respect to the issue of notice, FDL asserted that "Waste Watchers does not even claim to own property in proximity to the land in question. Nor does it establish that its members own such property."[8]

On January 28, 1998, Waste Watchers filed a response to FDL's motion to dismiss. Waste Watchers agreed that OEA lacked jurisdiction to address zoning issues, but insisted that issues "concerning the impact of wetland[s] destruction, diversion of leachate from an adjoining landfill, and radical proposed changes in storm water runoff and drainage[ ] go to the heart of what a Section 401 determination is all about." Waste Watchers attached to its response a September 4, 1997, office memorandum from IDEM employee Brett Crump ("Crump"). Crump's memorandum reads in relevant part as follows:

7. Upon receipt of the [wetlands] mitigation plan on April 23, 1997, I reviewed the plan and made a site investigation on May 29, 1997. I confirmed the wetland delineation and assessment of the wetlands proposed to be impacted and wetland mitigation site. Based on the information available, site investigation, and my best professional judgement the project could comply with our Water Quality Standards if the landfill was constructed in a manner that properly addressed any threat to ground water.

8. Before I made the site investigation, I requested a meeting with Mr. Mike Tragesser and Mr. Thomas Brown of

in support of its motion addresses only notice issues.

5. In its brief, IDEM notes that local zoning for the proposed landfill is the subject of another lawsuit in Steuben Circuit Court.

6. 327 IAC 15–5 is entitled "Storm Water Run–Off Associated with Construction Activity."

7. 327 IAC 15–6 is entitled "Storm Water Discharge Associated with Industrial Activity."

8. FDL further noted, "Although Waste Watchers asserts that its membership includes persons who own land adjoining the proposed landfill site, there is no evidence to support its assertion."

OSHWM [Office of Solid Hazardous Waste Management] to ascertain if there were any groundwater concerns and how to address them. We met and Mr. Brown informed me that there is an aquifer of significance located beneath the proposed landfill. He said OSHWM and Federal rules required the use of a double liner to ensure no leachate reaches the aquifer. I asked him to help me to draft a condition that I could use in the WQC to adequately protect the aquifer resulting in condition # 2 of the June 30, 1997, WQC. . . .

9. I drafted a WQC on June 10, 1997, and forwarded it through the proper channels. The WQC was signed by Matthew Rueff, Assistant Commissioner of OWM [Office of Water Management] and mailed out June 30, 1997. . . .

. . . . .

11. I received a call . . . on July 25, 1997, from Ms. Niann Lautzenhiser, a resident of Hamilton Lake. She expressed her concerns over the project and informed me of a culvert that connected the surface flow from the wetlands proposed to be impacted with an agriculture drain to Black Creek to Hamilton Lake. . . .

12. I was not aware of the culvert when I conducted my site investigation because it was not easily visible and Mr. Richardson [project manager for J.F. New & Associates, which requested the WQC on FDL's behalf] had called the wetlands to be impacted isolated. The presence of direct surface hydraulic links may possibly affect the project[']s ability to comply with Water Quality Standards *if the landfill is not properly constructed*. I have had contact with staff of OSHWM and will soon be formally requesting additional information

from that that will have a direct bearing on my opinion of the project.

(Emphasis added.)

On January 30, 1998, IDEM filed a reply to Waste Watchers' response to FDL's summary judgment motion. IDEM stated that Waste Watchers "fail[ed] to recognize that any storm water runoff from adjacent properties or leachate from the old landfill entering [FDL's] property will be directed to detention ponds" and would thus "end up in the same basin as the storm water runoff from the new landfill." IDEM further stated,

> The potential for a water quality violation will be less likely than the potential that exists now due to the fact that the storm water runoff and leachate (if any) is currently running uncontrolled off the site or entering the groundwater. If [FDL] moves forward with the proposed landfill project and causes a discharge from the basins that is in violation of the water quality standards, the discharge is an enforcement matter.

IDEM attached to its reply the affidavit of environmental engineer Stephen P. Reuter ("Reuter"), who stated that he was "very familiar with the site of proposed [FDL] landfill in Steuben County and also with the design of the proposed landfill." Reuter further stated,

> 5. It has been suggested in certain comments by those objecting to the Section 401 Certification that the proposed landfill project will. in some manner cause or accentuate problems for properties south of the proposed landfill due to leachate from the old (Apollo) landfill.
> 6. Presuming that leachate migrates from the old Apollo landfill onto the site, it is important to bear in mind that, under the currently existing conditions at the site, any potential leachate, and sediment from the poorly vegetated areas, can exit south of the landfill, and

across the County Road, with a very short detention time.

7. On the other hand, under the landfill design submitted to OSHWM, any potentially contaminated runoff from the old Apollo landfill would be directed to detention ponds with a minimum detention time of twenty-four (24) hours in a twenty-five (25) year intensity storm as required by Indiana law.

8. Furthermore, under the design submitted with our application, any runoff from the closed landfill will be combined with runoff from the new landfill, causing the runoff from the old site to be subject to the Indiana storm water regulations, and their associated monitoring requirements, under 327 IAC[ ]15.

On January 30, 1998, Waste Watchers filed a reply brief in support of its summary judgment motion. On February 2, 1998, Waste Watchers filed a response to what it characterized as IDEM's motion to dismiss. Waste Watchers asserted that "all IDEM did in reviewing [FDL's] Section 401 application was ask whether any standards would apply to discharges from the landfill itself. IDEM did not even ask what *other* water quality impacts would arise from wetlands destruction and the disturbance of existing flow and drainage patterns," specifically with respect to storm-water runoff and contaminated leachate from the Apollo landfill.

On February 20, 1998, Waste Watchers filed the executed affidavit of Indiana University Professor Daniel Edward Willard ("Willard") in support of its February 2 response.[9] Willard's affidavit reads in relevant part as follows:

2. I have inspected the site in Steuben County, Indiana on which [FDL] proposes to build a solid waste landfill (hereafter "the Site"). I have personal knowledge of the matters stated herein.

3. The Site contains several acres of wetlands.

4. The Site is part of a watershed for the surrounding upstream area. Several drain tiles as well as surface water runoff feed a stream that runs through the Site.

5. There is a small artificial pond on the Site.

6. An abandoned landfill is bordered by the Site on three sides. I observed leachate emanating from the surface of the abandoned landfill and flowing toward wetlands and the pond on the Site. In my opinion, surface water runoff from the old landfill carries the leachate into wetlands and the pond on the Site.

7. Wetlands *can* function to remove pollutants from water flowing through wetlands, to reduce the possibility of downstream flooding by absorbing peak floodwaters, and to reduce downstream sediment loadings and erosion from storm water runoff.

8. The wetlands on the Site *may* be serving all the purposes listed in paragraph 7 above.

9. If the proposed landfill is built on the Site, waters currently entering the Site will no longer be detained by wetlands on the Site. Therefore, the volume of runoff from the Site in a given period of time will increase. Those changes in flow *can* affect downstream water quality in the ditch connecting the Site to Black Creek, in Black Creek itself, and potentially in Hamilton Lake.

10. If the proposed landfill is built, any pollutants entering the Site that are

---

9. Waste Watchers had submitted an unsigned and unnotarized affidavit from Willard with its February 2 response.

currently being removed by the on-site wetlands—including pollutants in the leachate entering the Site from the adjoining abandoned landfill—will ultimately be carried directly off-site in runoff that will have to be diverted around the proposed landfill. Any increase in pollutant loadings downstream of the Site *could* negatively affect water quality in the ditch connecting the Site to Black Creek, in Black [Creek] itself, and potentially in Hamilton Lake.

11. The destruction of on-site wetlands associated with the proposed landfill project will increase sediment loadings in Site runoff. Such an increase in sediment loadings *could* negatively affect water quality in the ditch connecting the Site to Black Creek, in Black Creek itself, and potentially in Hamilton Lake.

12. The wetlands on-site *may* serve to reduce flooding downstream. An increase in downstream flooding will negatively affect downstream water quality.

13. The wetlands and waters on the Site are connected to state waters. Water flows through the Site. The proposed landfill will necessarily change water quality by destroying wetlands and changing water flow. Before issuing a Section 401 [WQC], [IDEM] should generally consider impacts on downstream water quality arising from wetlands destruction. With respect to the Site in question, IDEM must consider the impact on water quality arising from leachate entering the Site from the adjoining landfill, from potential increased flooding, and from increased downstream flow and sediment loadings.

On April 27, 1998, OEA's environmental law judge ("ELJ") issued a final order granting FDL's motion to dismiss/motion for summary judgment. OEA granted summary judgment in favor of FDL on the issues of notice and zoning; the final conclusion reads as follows:

8. Waste Watchers argue that "because of the proximity of the [FDL] site to the [Apollo] landfill ... the potential for leachate coming onto the property of Aggrieved Party have [*sic*] not adequately been addressed by [FDL] or properly considered by IDEM." Specifically, they argue that "[w]ithout the filtering process of the wetlands, the contaminated water runoff from the [Apollo] landfill will flow onto the Aggrieved Party, and adversely impact the entire watershed." Lastly, they argue that "storm water runoff has not been adequately addressed." .... These issues are addressed by the solid waste regulations: 329 IAC 10–20 *et seq.* In the event the IDEM approves the landfill, [FDL] will be required to comply with the regulations and accompanying permit. Moreover, prior to operating the landfill, [FDL] will be required to obtain an NPDES permit which will require it to meet water quality standards. *See* 327 IAC 5–2–2; 327 IAC 5–1–2(34); 327 IAC 5–2–10(4). As these issues are outside the purview of the § 401 Certification, Waste Watchers have not stated a claim upon which relief can be granted. [Ind. Trial Rule] 12(B)(6) (1997).

(Initial ellipsis in original.)

On May 27, 1998, Waste Watchers filed a verified petition for judicial review challenging only the above portion of OEA's order. In its petition, Waste Watchers claimed, "There was no evidence put before OEA that IDEM in fact considered the impacts upon water quality caused by runoff and leachate from the [Apollo] landfill and by wetlands destruction, and OEA made no such finding." Waste Watchers further alleged, "If the landfill is built on the strength of the present WQC, and even if it is operated in accordance with all

applicable solid waste rules, the negative water quality impacts of landfill *construction* will never be remedied because they have never even been considered." Waste Watchers requested a judgment reversing OEA's order and remanding the cause to OEA with instructions to revoke FDL's WQC and remand the cause to IDEM "for further consideration of the water-quality impacts of landfill construction."

On July 21, 1998, FDL and IDEM filed separate answers to Waste Watchers' petition asserting, *inter alia,* that Waste Watchers lacked standing to seek judicial review and had waived any issues not previously raised.

On July 29, 1999, Waste Watchers filed a memorandum in support of its petition for judicial review, alleging that "IDEM entirely failed to consider the surface water impacts of wetlands destruction, diversion of existing streams, and the diversion of leachate flows from [the Apollo] landfill *that will be caused by constructing and operating the landfill in its proposed location.*"

On September 2, 1999, IDEM submitted a response brief that concluded as follows:
The narrow issue before this Court is not the landfill versus the wetlands, but rather, whether the proposed landfill is capable of meeting the Indiana water quality standards. The Department has determined that the proposed landfill is capable of doing so, and issued the water quality certification accordingly. Other than bare allegations, Waste Watchers has not brought forward any admissible evidence to the contrary.
Also on this date, FDL filed a memorandum in opposition to Waste Watchers' petition in which it noted that Waste Watchers had *"never* identified any specific water quality standard which was required to be addressed by IDEM but was not addressed" and had "failed to recognize that

any storm water runoff or leachate from the [Apollo] landfill which enters [FDL's] property .... will end up in the same detention ponds as the storm water runoff from the new landfill." FDL also filed a motion to strike portions of Waste Watchers' memorandum, including Willard's affidavit, alleging that none of the relevant portions had been properly designated in summary judgment proceedings before OEA and that certain materials were unverified, speculative, and "non-evidentiary."

On March 24, 2000, the trial court entered its findings of fact and conclusions thereon. The trial court's findings read in relevant part as follows:

4. On April 21, 1997, [FDL] applied for a WQC to IDEM. In renewing the WQC application, IDEM focused solely on ground water impact from future operations of the proposed landfill and conditioned the WQC necessary to protect the ground water. ·

5. IDEM did not consider the impact on downstream water quality of wetland[s] destruction and the diversion of surface water flows through the landfill site before issuing the WQC. IDEM did not consider all relevant surface water quality impacts arising from the construction of the landfill.

6. The Administrative Record contains the Affidavit of Daniel Willard, which contains *undisputed evidence* that landfill construction in the proposed location will have an impact on downstream water quality....

7. Because IDEM did not consider surface water quality impacts prior to issuing the WQC to [FDL], the water quality impacts noted by Dr. Willard are unknown.

8. Petitioner Waste Watchers is a non-profit public interest environmental organization existing under the laws of the State of Indiana. It is undisputed that Waste Watchers members live near and own property adjacent to and near the landfill site, including along Black Creek and Hamilton Lake, which receive the waters that flow through and from the Site. Waste Watchers' membership includes numerous members of an Amish community near the proposed landfill site, a number of whom were petitioners in the OEA action under judicial review.

. . . .

12. Waste Watchers' petition for administrative review alleged that IDEM failed to consider whether all of the impacts of landfill construction would harm downstream water quality. Waste Watchers' administrative petition alleged that merely placing the proposed landfill in the proposed location would permanently and irreparabl[y] harm water quality by (1) destroying wetlands, (2) changing drainage and runoff patterns by diverting water that currently flows through the Site, and (3) allowing leachate currently leaking from the [Apollo] landfill immediately adjacent to [FDL's] site to escape directly to downstream waters, instead of being retained and treated by wetlands on the site as is now the case.

(Emphasis added.)

The trial court's conclusions read in relevant part as follows:

20. Waste Watchers had standing to seek administrative review of IDEM's WQC decision pursuant to IND. CODE § 4–21.5–3–7(1)(B) because Waste Watchers members were aggrieved or adversely affected by a decision that would allow the construction of a landfill adjacent to or near their property and homes, without full consideration of the impacts on water quality arising from such construction.

21. Second, the evidence [FDL] objects to—particularly the Willard Affidavit—is now part of the Administrative Record certified by OEA, and it is too late to alter the Record. On February 2, 1998, in Waste Watchers' response to an IDEM brief filed with OEA, Waste Watchers attached the Willard Affidavit as an exhibit and cited to the affidavit in its brief. Waste Watchers' brief is part of the Administrative Record designated by OEA, which means that, as a matter of law, it was one of the items considered by OEA in making the decision that this Court is considering on judicial review. IND. CODE § 4–21.5–5–13(a). The OEA Order specifically listed Waste Watchers' response to IDEM's Motion to Dismiss, which included the Willard Affidavit, among the documents OEA considered in issuing its Order, thereby making the Willard Affidavit part of the Administrative Record. . . .

22. [FDL's] Trial Rule 56(C) argument also must fail because the Trial Rules do not apply to the OEA proceedings. An administrative agency may elect to follow the Trial Rules, but Indiana courts have long held that the Trial Rules are not mandatory rules of procedure for administrative agencies. Proceedings before administrative boards like OEA are not required to be conducted like judicial proceedings, even when such proceedings are

judicial in nature. Accordingly, the Trial Rules which govern procedure and practice in courts do not apply to proceedings before administrative agencies nor to the proceedings requisite to invoking the jurisdiction of reviewing judicial authority. Consequently, the Trial Rules do not apply in administrative proceedings. While OEA may choose to apply the Trial Rules in a given case, there is no indication in the Administrative Record that OEA elected to do so here. For these reasons, the Trial Rules did not and do not apply so as to support [FDL's] Motion to Strike.

23. Finally, [FDL's] motion to strike is without merit because it is simply too late to exclude relevant portions of the Administrative Record that *OEA has already considered* from this Court's consideration. The Administrative Record is, as a matter of law, whatever OEA [*sic*]

24. For the foregoing reasons, [FDL's] motion to strike is DENIED.

25. As a matter of law, in considering a Section 401 WQC application, IDEM must consider the water quality impacts associated with the construction of a proposed project as well as the project's operation:

Any applicant for a Federal license or permit to conduct any activity including, but not limited to, *the construction or operation of facilities,* which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate ... that any such discharge will comply with [the Clean Water Act].

[33] U.S.C. § 1341(a)(1) (emphasis added). It is clear that, as a matter of law, a State considering a Section 401 WQC application must look at more than just the discharge from within a facility's own operations.

26. Among the factors affecting water quality that IDEM must consider are impacts on wetlands....

27. The Willard Affidavit establishes the importance of surface water quality impacts arising from wetlands destruction and the diversion of existing stream and leachate flows that will be caused by building a landfill at [FDL's] site, in terms of determining the impacts on downstream water quality.

28. For these reasons, the impacts of landfill construction—as opposed to landfill operation—at the proposed [FDL] landfill site are directly relevant to water quality impacts downstream of the site and should have been considered by IDEM in reviewing the WQC.

29. The Administrative Record clearly establishes that IDEM did not consider the impacts of wetlands destruction, the diversion of existing stream flows, and the diversion of leachate flows from the adjacent abandoned landfill on downstream water quality.

30. The fact that the WQC includes conditions is insufficient to address Waste Watchers' water quality concerns. The WQC must make sense in light of the facts and the record. Here, the WQC's conditions simply do not address Waste Watchers' surface water quality concerns....

31. Therefore, Waste Watchers' administrative petition raised legitimate, legally relevant issues which should have been considered in a hearing

before OEA. Instead, the OEA Order dismissing Waste Watchers' administrative petition for failing to state a claim was arbitrary, capricious, an abuse of discretion, contrary to law, and contrary to the procedures required by law.

. . . .

36. OEA's order makes no specific findings of fact on the issues in question, but states mere conclusions. The primary issue raised by Waste Watchers with regard to the WQC was whether IDEM should have considered the potential impacts of wetlands destruction, diversion of existing streams which currently run through the site, and diversion of leachate flows from the [Apollo] landfill. In response, OEA merely concluded that these issues will be addressed by other State regulations. Besides the legal error inherent in this conclusion that the Court found above, OEA failed to explain how the cited regulations will respond to Waste Watchers' concerns. This Court has found that they will not. In addition, OEA fails to mention, let alone refute, any of the evidence cited by Waste Watchers. It is unclear from the OEA Order why OEA believed that Waste Watchers' evidence was insufficient to overcome a motion to dismiss or motion for summary judgment. The OEA Order is therefore contrary to law and is not supported by substantial evidence.

37. [FDL] argues that specific findings of fact are not required in an OEA summary judgment decision because AOPA's summary judgment provision does not specifically say so. See IND. CODE § 42–21.5–[3]–23. However, the AOPA [Administrative Orders and Proce-

dures Act ("the Act")] provision requiring specific findings of fact, IND. CODE § 4–21.5–[3]–27(b) applies to *all* final agency orders, without exception. Because the OEA Order is specifically denominated as a Final Order, reviewable under AOPA, the requirement for specific findings of fact for all aspects of the order applies.

38. Because IDEM was legally obligated to consider all impacts of landfill construction, but in fact failed to consider all legally relevant impacts, and because OEA erred as a matter of law in finding the impacts asserted by Waste Watchers to be irrelevant, and because OEA's conclusions were unsupported by findings of fact, the OEA Order is arbitrary, capricious, an abuse of discretion, is contrary to law and the procedures required by law, and is unsupported by substantial evidence. Petitioner Waste Watchers is therefore prejudiced by OEA's decision to uphold IDEM's WQC determination and to deny Waste Watchers an evidentiary hearing on an IDEM determination that Waste Watchers had standing to challenge, because Waste Watchers is substantially aggrieved by a decision that will allow the construction of a landfill adjacent to or near their homes and property, with an unknown effect upon water quality.

(Citations omitted.) The trial court reversed OEA's order and remanded for an evidentiary hearing on Waste Watchers' petition for administrative review.

### Discussion and Decision

#### I. Standing

FDL asserts that Waste Watchers lacked standing to petition for either

administrative or judicial review. To qualify for review of an agency's order under Indiana Code Section 4–21.5–3–7(a), "[a] person must petition for review in a writing that: (1) states facts demonstrating that: ... (B) the petitioner is aggrieved or adversely affected by the order[.]" FDL asserts that Waste Watchers had no standing to petition for administrative review because it was neither aggrieved nor adversely affected by IDEM's issuance of the WQC. Because FDL failed to challenge Waste Watchers' standing during the administrative proceedings, it has waived this issue on appeal. *See Wildwood Park Cmty. v. Fort Wayne City Plan Comm'n*, 182 Ind.App. 578, 583–84, 396 N.E.2d 678, 681–82 (1979).[10]

10. In concluding that FDL has waived the issue of standing, we respectfully disapprove of cases holding that this court may address standing *sua sponte* on appeal. In *Matter of City of Fort Wayne*, 178 Ind.App. 228, 381 N.E.2d 1093 (1978), *trans. denied*, a panel of this court stated,

> In a contest of the propriety of annexation the trial court is charged with first passing judgment upon the standing of the parties to maintain the litigation through an examination of the sufficiency of the remonstrance. Thus, the City properly framed the question of whether the court had subject matter jurisdiction over this action in its motion for summary judgment [maintaining that the remonstrance was insufficient due to invalid signatures].
>
> Such issue may be raised at any point during litigation and if not raised by the parties it is the duty of the reviewing court to determine the issue *sua sponte*. *McGraw v. Marion County Plan Commission* (1961), 131 Ind.App. 686, 174 N.E.2d 757. In spite of appellants' contention that jurisdiction was waived per an earlier stipulation, the issue was appropriate for the court's determination, as subject matter jurisdiction cannot be waived or conferred by consent or agreement of the parties. Without a valid remonstrance, regardless of any previous stipulations the court cannot proceed further.

*Id.*, 178 Ind.App. at 230, 381 N.E.2d at 1095–96 (citations omitted). The "[s]uch issue" to which the *City of Fort Wayne* court referred is subject matter jurisdiction. *See McGraw*, 131 Ind.App. at 695, 174 N.E.2d at 761:

> Neither party to this appeal has presented to us what we consider to be the crucial question in this case. The power to entertain this particular proceeding depended upon compliance with the statutory conditions precedent to the exercise of that power. Since this matter did not involve a decision of the Plan Commission, there was a failure to comply with the conditions of the statute for review. Thus, the court had no jurisdiction over the subject-matter involved herein. Questions as to such jurisdiction may be raised at any time. If not raised by a party, it is our duty *sua sponte* to determine it.

(Citation omitted.) Nevertheless, a line of cases has misinterpreted "[s]uch issue" as standing and has relied on *City of Fort Wayne* in holding that standing "may be raised at any point during the litigation and if not raised by the 'parties it is the duty of the reviewing court to determine the issue *sua sponte*." *See, e.g., In re C.W.*, 723 N.E.2d 956, 962 (Ind.Ct.App.2000), *trans. denied; Collard v. Enyeart*, 718 N.E.2d 1156, 1159 (Ind.Ct. App.1999), *trans. denied* (2000); *Beason–Strange–Claussen v. City of Hammond*, 701 N.E.2d 1288, 1290 (Ind.Ct.App.1998), *trans. denied* (1999); *State Dep't of Pub. Welfare v. Bair*, 463 N.E.2d 1388, 1391 (Ind.Ct.App. 1984), *trans. denied*. As the *Wildwood Park* court correctly noted, however, a party's "legal capacity ... to assert its claim" affects the trial court's jurisdiction over the particular case and not jurisdiction over the subject matter. 182 Ind.App. at 583, 396 N.E.2d at 681. "Unlike subject matter jurisdiction, which cannot be waived by a party and may be raised, *sua sponte*, by the court, jurisdiction over the particular case may be waived by the failure to make a specific and timely objection." *Id.* (citing, *inter alia*, *Bd. of Trustees of Town of New Haven v. City of Fort Wayne*, 268 Ind. 415, 422–23, 375 N.E.2d 1112, 1117 (1978)). *Cf. Matter of Lawrance*, 579 N.E.2d 32, 37 (Ind.1991) (discussing public interest exception to mootness doctrine; "While Article III of the United States Constitution limits the jurisdiction of federal courts to actual cases and controversies, the Indiana Constitution does not contain any similar restraint."); *City of Indianapolis v. Indiana State Bd. of Tax Comm'rs*, 261 Ind. 635, 638, 308 N.E.2d 868, 870 (1974):

Under the Act, "[i]f a petition for [administrative] review is granted, the petitioner becomes a party to the proceeding[.]" IND.CODE § 4–21.5–3–7(d). "A person who was a party to the agency proceedings that led to the agency action" has standing to obtain judicial review of the action. *Id.* § 4–21.5–5–3(a)(2). Thus, as a party to the agency proceedings, Waste Watchers had standing to petition for judicial review of the ELJ's order.

## II. Reversal of OEA's Order

■ We initially observe that judicial review of an administrative decision is limited. Review of an agency's decision is largely confined to the agency record and the court "may not try the case de novo or substitute its judgment for that of the agency." Deference is to be given by the reviewing court to the expertise of the administrative body, and the decision should be reversed only if it is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to a constitutional right, power, privilege, or immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. Additionally, we note that an action is arbitrary and capricious only where there is no reasonable basis for the action. The challenging party has the burden of proving that an administrative action was arbitrary and capricious.

Finally, the reviewing court should neither substitute its judgment on factual matters for that of the agency, nor reweigh the evidence. Rather, the evidence is considered in the light most favorable to the administrative proceedings, and the agency's action will not be disturbed so long as there is substantial evidence to support the determination.

*Indiana Dep't of Envtl. Mgmt. v. Adapto, Inc.,* 717 N.E.2d 646, 649 (Ind.Ct.App. 1999) (citations omitted).

■ In paragraph 8 of its final order, the ELJ dismissed several issues under Indiana Trial Rule 12(B)(6) due to Waste Watchers' failure to state a claim upon which relief could be granted. Given the ELJ's specific mention of Trial Rule 12(B)(6) in its order, we must reject the trial court's determination that "there is no indication in the Administrative Record" that the ELJ elected to apply the Trial Rules in the administrative proceedings. *See* 315 IAC 1–3–1(b)(10) (permitting ELJ to apply Trial Rules where not inconsistent with IND.CODE § 4–21.5 and this title). Although we have never addressed this issue in an administrative context, we note that where, as here, matters outside the pleadings are presented to and not excluded by the tribunal, a motion to dismiss shall be treated as one for summary judgment under Indiana Trial Rule 56. *See Bledsoe v. Fleming,* 712 N.E.2d 1067, 1070 (Ind.Ct. App.1999).

■ The question still remains, however, whether the ELJ's findings are sufficiently detailed to support its decision on review. *See* IND.CODE § 4–21.5–3–23(c) (administrative summary judgment proceedings: "The administrative law judge shall then make an order specifying the

For the disposition of cases and controversies, the Court requires adverse parties before it. Standing focuses generally upon the question of whether the complaining party is the proper person to invoke the Court's power. However, more fundamentally, standing is a restraint upon this Court's exercise of its jurisdiction in that we cannot proceed where there is no demonstrable injury to the complainant before us. Indeed, absent a 'case or controversy,' we have no jurisdiction to proceed.

facts that appear without substantial controversy...."); *id.* § 4–21.5–3–27(b) (requirements for final administrative orders and findings: "The order must include, separately stated, findings of fact for all aspects of the order.... Findings of ultimate fact must be accompanied by a concise statement of the underlying basic facts of record to support the findings."); *Regester v. Indiana State Bd. of Nursing,* 703 N.E.2d 147, 150 (Ind.1998) ("While this Court has never specified a particular method for determining the adequacy of findings under [IND.CODE § 4–21.5–3–27(b) ], we find merit in the Court of Appeals' observation that the findings must inform the parties of the evidentiary bases upon which the ultimate findings rest and must allow for meaningful judicial review."); *cf. Jackson v. Cigna/Ford Electronics and Refrigeration Corp.,* 677 N.E.2d 1098, 1102 (Ind.Ct.App.1997) ("An administrative agency must *in all cases* set out written findings of fact in support of its decision so that an appellate court may intelligently review the decision without speculating as to the agency's rationale.") (emphasis added); *Jackson v. DeFabis,*

553 N.E.2d 1212, 1215 (Ind.Ct.App.1990) (noting that "findings of fact are unnecessary on decisions of summary judgment motions"). Waste Watchers contends that the ELJ's order "makes no specific findings of fact on the issues in question, but states mere conclusions"; furthermore, it "does not even mention, let alone refute, any of Waste Watchers' evidence, such as the Crump Memorandum and the Willard Affidavit" and is thus insufficient as a basis for review.

Given the nature and substance of Waste Watchers' evidence, we disagree. Even if we were to consider Crump's memorandum and Willard's affidavit at face value, they fail to demonstrate that IDEM did not consider the water quality concerns raised by Waste Watchers in its petition for administrative review.[11] Since Waste Watchers offered no substantive facts to support its argument that IDEM erred in issuing the WQC to FDL, the ELJ's order provides us with a sufficient explanation of its decision to uphold IDEM's issuance of the WQC.

---

**11.** As previously mentioned, FDL filed a motion to strike certain materials submitted by Waste Watchers, including Willard's affidavit, from the administrative record because they were not specifically designated in response to FDL's summary judgment motion. Complicating matters further, Waste Watchers submitted Willard's affidavit in response to FDL's alternative motion to dismiss, and the ELJ dismissed the issues raised in Willard's affidavit under Trial Rule 12(B)(6). Because FDL's motion to dismiss/motion for summary judgment contained matters outside the pleading that were not excluded by the ELJ, we must treat FDL's motion to dismiss as a motion for summary judgment and may therefore consider Willard's affidavit in reviewing the propriety of the ELJ's ruling. *See* Ind. Trial Rule 12(B) (where, on motion to dismiss for failure to state a claim under subdivision (B)(6), "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment

and disposed of as provided in [Trial] Rule 56. In such case, all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."). Thus, we do not reach the question of whether, under different procedural circumstances, a trial court may consider evidence not specifically designated in support of or in opposition to a summary judgment motion at the administrative level; neither do we reach the questions of whether or when a party must move to strike such evidence from the administrative record. *See* IND.CODE § 4–21.5–3–34 (listing contents of "agency record of the proceeding" and noting that "[e]xcept to the extent that a statute provides otherwise, the agency record ... constitutes the exclusive basis for agency action in proceedings under this chapter and for judicial review of a proceeding under this chapter"); *see also id.* § 4–21.5–5–13 (requiring petitioner for judicial review to submit certified copy of agency record).

We now turn to the relevant portions of the statute at the crux of the dispute, 33 U.S.C. § 1341:

**(a) Compliance with applicable requirements; application; procedures; license suspension**

(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the *construction or operation* of facilities which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate that any such discharge *will comply* with the applicable provisions of sections 1311, 1312, 1313, 1316 and 1317 of this title. . . .

. . . .

**(d) Limitations and monitoring requirements of certification**

Any certification provided under this section shall set forth any effluent limitations and other limitations, and monitoring requirements necessary to assure that any applicant for a Federal license or permit *will comply* with any applicable effluent limitations and other limitations, under section 1311 or 1312 of this title, standard of performance under section 1316 of this title, or prohibition, effluent standard, or pretreatment standard under section 1317 of this title, and *with any other appropriate requirement of State law* set forth in such certification, and shall become a condition on

any Federal license or permit subject to the provisions of this section.

(Emphases added.) [12] As previously mentioned, IDEM determined that "[b]ased on the site investigation and available information, . . . [FDL's landfill] project will comply with the applicable provisions of the 327 IAC 2 sections 301, 302, 303, 306, and 307 of the Clean Water Act if [FDL] complies with" the five conditions mentioned above.

 In its petition for administrative review, Waste Watchers summarily alleged that "the storm water runoff plan and the potential for leachate coming onto the property of [Haskins] ha[d] not adequately been addressed by [FDL] or properly considered by IDEM." Waste Watchers further alleged that "[f]illing [the] wetlands by the proposed landfill would adversely impact [Haskin's] property and others nearby" because the wetlands "function as a filter, especially from the abandoned landfill and the uplands. If these wetlands are destroyed, their function is lost." Willard's affidavit indicates that he inspected the proposed landfill site and asserts that

[t]he wetlands and waters on the Site are connected to state waters. Water flows through the Site. The proposed landfill will necessarily change water quality by destroying wetlands and changing water flow. Before issuing a Section 401[WQC], [IDEM] should generally consider impacts on downstream water quality arising from wetlands destruction. With respect to the Site in question, IDEM must consider the impact on water quality arising from leachate entering the Site from the adjoining

---

12. Section 1311 governs discharge of pollutants; section 1312 governs "[w]ater quality related effluent limitations"; section 1313 governs "[w]ater quality standards and implementation plans"; section 1316 addresses "[n]ational standards of performance" controlling discharge of pollutants; and section 1317 governs "[t]oxic and pretreatment effluent standards." These regulations are also referred to as sections 301, 302, 303, 306, and 307 of the Clean Water Act.

landfill, from potential increased flooding, and from increased downstream flow and sediment loadings.

As the party requesting a stay of IDEM's issuance of the WQC, Waste Watchers bore the "burden of persuasion and the burden of going forward with the proof of [its] request" under Indiana Code Section 4–21.5–3–14(c). However, Waste Watchers submitted no facts establishing that IDEM failed to consider the above-mentioned issues during the WQC process. In its response to FDL's and IDEM's memoranda opposing its petition for judicial review, Waste Watchers stated, "All IDEM had to do was produce an affidavit stating that IDEM *did* consider such issues and found that such impacts would not be severe enough to warrant denial of the WQC." Waste Watchers places the burden on the wrong party.

Although Willard inspected the site of the proposed landfill, there is no indication that he reviewed FDL's plans for its construction and operation or had any knowledge that IDEM officials failed to consider the issues mentioned in his affidavit, which contains unsupported speculation about the *possible* deleterious effects of landfill construction and wetlands destruction. *See* IND.CODE § 4–2.5–3–23(d) (requiring affidavits opposing summary judgment to "set forth *facts* that are admissible in evidence") (emphasis added). Nor is there any indication that Waste Watchers deposed or sought affidavits from IDEM officials involved in the WQC approval process. As for Crump's memorandum, in which he stated that he had been unaware of the presence of a culvert on FDL's proposed landfill site before IDEM issued the WQC, he further stated that "[t]he presence of direct surface hydraulic links may possibly affect the project[']s ability to comply with Water Quality Standards *if the landfill is not properly constructed.*" (Emphasis added.) Waste Watchers fails to demonstrate that construction compliance is anything other than an enforcement issue.[13]

More generally, Waste Watchers cited no state or federal clean water standard requiring IDEM to consider the above issues during the WQC approval process. We do not mean to suggest that such standards do not exist but simply note this as further evidence of Waste Watchers' failure to meet its burden of proof at the administrative level. Waste Watchers merely presumes, without proving, that IDEM did not comply with the certification requirements of Section 401 and that FDL's plans for and construction and operation of the landfill do not comply with applicable clean water standards.

We agree with FDL that Section 401 authorizes, rather than requires, a State to impose additional "conditions and limitations" on a WQC applicant's "activity as a whole once the threshold condition, the existence of a discharge, is satisfied." *See PUD No. 1 of Jefferson County v. Washington Dep't of Ecology,* 511 U.S. 700, 711–12, 114 S.Ct. 1900, 128 L.Ed.2d 716 (1994) ("Section 401(a)(1) identifies the category of activities subject to certification—namely, those with discharges. And § 401(d) is most reasonably read as *authorizing* additional conditions and limitations on the activity as a whole once the threshold condition, the existence of a discharge,

---

13. Waste Watchers seizes upon Crump's failure to notice the culvert during his initial investigation of the landfill site and attempts to characterize this oversight as a failure to consider "critical water quality impacts" in its decision to issue the WQC; however, Waste Watchers neither specifies the applicable water quality standards nor explains how Crump's failure to notice a particular hydrogeological feature necessarily equates with IDEM's failure to otherwise consider such standards during the certification process.

is satisfied.") (emphasis added). Waste Watchers has failed to establish that the State has imposed such "additional conditions and limitations" on FDL's "activity as a whole."

■ However, we agree with Waste Watchers that Section 401 clearly requires IDEM to determine whether any discharge from the construction *and* operation of a facility *will comply* with the applicable provisions of the Clean Water Act *before* it issues a WQC to an applicant. To the extent that OEA's order might suggest otherwise, we would disagree with this interpretation of Section 401, since it would disregard the plain meaning of the statute and render the certification process a meaningless "rubber stamping" of applicants' proposals. Once IDEM determines that an applicant's construction and operation of a facility will comply with applicable water quality standards, ensuring the applicant's adherence to these standards becomes an enforcement issue.

In summary, we conclude that the trial court erred in determining that the record "clearly establishes that IDEM did not consider the impacts of wetland destruction, the diversion of existing stream flows, and the diversion of leachate flows from the [Apollo] landfill on downstream water quality" and that OEA's order was "arbitrary, capricious, an abuse of discretion, is contrary to law and the procedures required by law, and is unsupported by substantial evidence." Waste Watchers failed to specify which water quality standards IDEM allegedly failed to consider during the certification process, let alone establish whether IDEM failed to do so. IDEM determined that FDL's proposal "will comply" with specific provisions of the Clean Water Act if it complies with the conditions listed in the WQC; FDL's compliance with these provisions and conditions is an enforcement issue beyond the scope

of the certification process and the issues raised by Waste Watchers in its petition for administrative review. Therefore, we reverse the trial court's judgment and affirm OEA's order upholding IDEM's issuance of the Section 401 WQC to FDL.

Reversed.

BAKER, J., and BARNES, J., concur.